COPY

UNDER SEAL

1 | EILEEN M. DECKER
United States Attorney
2 | LAWRENCE S. MIDDLETON
Assistant United States Attorney
3 | Chief, Criminal Division
DENNISE D. WILLETT
4 | Assistant United States Attorney
Chief, Santa Ana Branch Office
5 | JOSHUA M. ROBBINS (Cal. Bar No. 270553)
SCOTT D. TENLEY (Cal. Bar No. 298911)
6 | Assistant United States Attorneys
ASHWIN JANAKIRAM (Cal. Bar No. 277513)
7 | Special Assistant United States Attorney
       8000 United States Courthouse
8      411 West Fourth Street
       Santa Ana, California 92701
9      Telephone: (714) 338-2829
       Facsimile: (714) 338-3561
10     E-mail:    scott.tenley@usdoj.gov
11 | Attorneys for Plaintiff
UNITED STATES OF AMERICA
12

FILED - SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT

DEC 1 0 2015

CENTRAL DISTRICT OF CALIFORNIA
BY                        DEPUTY

13 |                UNITED STATES DISTRICT COURT

14 |            FOR THE CENTRAL DISTRICT OF CALIFORNIA

15 |                     SOUTHERN DIVISION

SACR15-00155

16 | UNITED STATES OF AMERICA,          No. SA CR 15-

17 |            Plaintiff,              PLEA AGREEMENT FOR DEFENDANT
                                       MICHAEL R. DROBOT
18 |            v.

19 | MICHAEL R. DROBOT,

20 |            Defendant.

21

22

23 |      1.   This constitutes the plea agreement between MICHAEL R.

24 | DROBOT ("defendant") and the United States Attorney's Office for the

25 | Central District of California (the "USAO") in the above-captioned

26 | case.  This agreement is limited to the USAO and cannot bind any

27 | other federal, state, local, or foreign prosecuting, enforcement,

28 | administrative, or regulatory authorities.

## DEFENDANT'S OBLIGATIONS

2.   Defendant agrees to:

a.   Give up the right to indictment by a grand jury and, at the earliest opportunity requested by the USAO and provided by the Court, appear and plead guilty to a two-count information in the form attached to this agreement as Exhibit A or a substantially similar form, which charges defendant with Conspiracy, in violation of 18 U.S.C. § 371, and Payment of Kickbacks in Connection with a Federal Health Care Program, in violation of 42 U.S.C. § 1320a-7b(b)(2)(A).

b.   Not contest facts agreed to in this agreement.

c.   Abide by all agreements regarding sentencing contained in this agreement.

d.   Appear for all court appearances, surrender as ordered for service of sentence, obey all conditions of any bond, and obey any other ongoing court order in this matter.

e.   Not commit any crime; however, offenses that would be excluded for sentencing purposes under United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not within the scope of this agreement.

f.   Be truthful at all times with Pretrial Services, the United States Probation Office, and the Court.

g.   Pay the applicable special assessments at or before the time of sentencing unless defendant lacks the ability to pay and prior to sentencing submits a completed financial statement on a form to be provided by the USAO.

3.   Defendant further agrees:

a.   Truthfully to disclose to law enforcement officials, at a date and time to be set by the USAO, the location of,

2

1   defendant's ownership interest in, and all other information known to
2   defendant about, all monies, properties, and/or assets of any kind,
3   derived from or acquired as a result of, or used to facilitate the
4   commission of, defendant's illegal activities, and to forfeit all
5   right, title, and interest in and to such items.

6          b.   To the Court's entry of an order of forfeiture at or
7   before sentencing with respect to these assets and to the forfeiture
8   of the assets.

9          c.   To take whatever steps are necessary to pass to the
10  United States clear title to the assets described above, including,
11  without limitation, the execution of a consent decree of forfeiture
12  and the completing of any other legal documents required for the
13  transfer of title to the United States.

14         d.   Not to contest any administrative forfeiture
15  proceedings or civil judicial proceedings commenced by the United
16  States of America against these properties.

17         e.   Not to assist any other individual in any effort
18  falsely to contest the forfeiture of the assets described above.

19         f.   Not to claim that reasonable cause to seize the assets
20  was lacking.

21         g.   To prevent the transfer, sale, destruction, or loss of
22  any and all assets described above to the extent defendant has the
23  ability to do so.

24         h.   To fill out and deliver to the USAO a completed
25  financial statement listing defendant's assets on a form provided by
26  the USAO.

27     4.   Defendant further agrees to cooperate fully with the USAO,
28  the Federal Bureau of Investigation, the United States Postal

3

1   Inspection Service - Office of the Inspector General, the Internal

2   Revenue Service, and, as directed by the USAO, any other federal,

3   state, local, or foreign prosecuting, enforcement, administrative, or

4   regulatory authority.   This cooperation requires defendant to:

5           a.   Respond truthfully and completely to all questions

6   that may be put to defendant, whether in interviews, before a grand

7   jury, or at any trial or other court proceeding.

8           b.   Attend all meetings, grand jury sessions, trials or

9   other proceedings at which defendant's presence is requested by the

10  USAO or compelled by subpoena or court order.

11          c.   Produce voluntarily all documents, records, or other

12  tangible evidence relating to matters about which the USAO, or its

13  designee, inquires.

14  5.   For purposes of this agreement: (1) "Cooperation

15  Information" shall mean any statements made, or documents, records,

16  tangible evidence, or other information provided, by defendant

17  pursuant to defendant's cooperation under this agreement; and

18  (2) "Plea Information" shall mean any statements made by defendant,

19  under oath, at the guilty plea hearing and the agreed to factual

20  basis statement in this agreement.

21                          THE USAO'S OBLIGATIONS

22  6.   The USAO agrees to:

23          a.   Not contest facts agreed to in this agreement.

24          b.   Abide by all agreements regarding sentencing contained

25  in this agreement.

26          c.   At the time of sentencing, provided that defendant

27  demonstrates an acceptance of responsibility for the offenses up to

28  and including the time of sentencing, recommend a two-level reduction

1  in the applicable Sentencing Guidelines offense level, pursuant to
2  U.S.S.G. § 3E1.1, and recommend and, if necessary, move for an
3  additional one-level reduction if available under that section.

4          d.    Recommend that defendant be sentenced to a term of
5  imprisonment no higher than the low end of the applicable Sentencing
6  Guidelines range, provided that the offense level used by the Court
7  to determine that range is 31 or higher and provided that the Court
8  does not depart downward in offense level or criminal history
9  category.   For purposes of this agreement, the low end of the
10 Sentencing Guidelines range is that defined by the Sentencing Table
11 in U.S.S.G. Chapter 5, Part A.

12         e.    Except for criminal tax violations (including
13 conspiracy to commit such violations chargeable under 18 U.S.C.
14 § 371), not further criminally prosecute defendant for violations
15 arising out of defendant's conduct described in the agreed-to factual
16 basis set forth in paragraph 22 below.   Defendant understands that
17 the USAO is free to criminally prosecute defendant for any other
18 unlawful past conduct or any unlawful conduct that occurs after the
19 date of this agreement.   Defendant agrees that at the time of
20 sentencing the Court may consider the uncharged conduct in
21 determining the applicable Sentencing Guidelines range, the propriety
22 and extent of any departure from that range, and the sentence to be
23 imposed after consideration of the Sentencing Guidelines and all
24 other relevant factors under 18 U.S.C. § 3553(a).

25         f.    The parties further understand that the Fraud Section
26 of the Civil Division of the United States Department of Justice has
27 represented that should defendant enter a guilty plea pursuant to
28 this agreement, it has no present intention to pursue civil action

5

against defendant arising out of defendant's conduct described in the
agreed-to factual basis set forth in paragraph 22 below ("factual
basis").  The parties further understand that the California
Department of Insurance has represented that it does not intend to
refer conduct described in the factual basis to California state
prosecutorial agencies, on its own initiative, for additional
criminal prosecution.  If a prosecutorial agency requests information
regarding the California Department of Insurance's investigation of
facts or circumstances related to the factual basis, the California
Department of Insurance will cooperate with that prosecutorial agency
and present any evidence in its possession.  Defendant, however,
understands that neither the Fraud Section of the Civil Division of
the Department of Justice or the California Department of Insurance
is bound by this agreement, and their decision to forego such action
is not a condition of this agreement.

    7.   The USAO further agrees:

    a.   Not to offer as evidence in its case-in-chief in the
above-captioned case or any other criminal prosecution that may be
brought against defendant by the USAO, or in connection with any
sentencing proceeding in any criminal case that may be brought
against defendant by the USAO, any Cooperation Information.
Defendant agrees, however, that the USAO may use both Cooperation
Information and Plea Information: (1) to obtain and pursue leads to
other evidence, which evidence may be used for any purpose, including
any criminal prosecution of defendant; (2) to cross-examine defendant
should defendant testify, or to rebut any evidence offered, or
argument or representation made, by defendant, defendant's counsel,
or a witness called by defendant in any trial, sentencing hearing, or

1    other court proceeding; and (3) in any criminal prosecution of

2    defendant for false statement, obstruction of justice, or perjury.

3              b.    Not to use Cooperation Information against defendant

4    at sentencing for the purpose of determining the applicable guideline

5    range, including the appropriateness of an upward departure, or the

6    sentence to be imposed, and to recommend to the Court that

7    Cooperation Information not be used in determining the applicable

8    guideline range or the sentence to be imposed.  Defendant

9    understands, however, that Cooperation Information will be disclosed

10   to the probation office and the Court, and that the Court may use

11   Cooperation Information for the purposes set forth in U.S.S.G.

12   § 1B1.8(b) and for determining the sentence to be imposed.

13             c.    In connection with defendant's sentencing, to bring to

14   the Court's attention the nature and extent of defendant's

15   cooperation.

16             d.    If the USAO determines, in its exclusive judgment,

17   that defendant has both complied with defendant's obligations under

18   paragraphs 2 and 3 above and provided substantial assistance to law

19   enforcement in the prosecution or investigation of another

20   ("substantial assistance"), to move the Court pursuant to U.S.S.G.

21   § 5K1.1 to fix an offense level and corresponding guideline range

22   below that otherwise dictated by the sentencing guidelines, and to

23   recommend a term of imprisonment within this reduced range.

24             <u>DEFENDANT'S UNDERSTANDINGS REGARDING COOPERATION</u>

25        8.   Defendant understands the following:

26             a.    Any knowingly false or misleading statement by

27   defendant will subject defendant to prosecution for false statement,

28

                                    7

1    obstruction of justice, and perjury and will constitute a breach by
2    defendant of this agreement.

3           b.    Nothing in this agreement requires the USAO or any
4    other prosecuting, enforcement, administrative, or regulatory
5    authority to accept any cooperation or assistance that defendant may
6    offer, or to use it in any particular way.

7           c.    Defendant cannot withdraw defendant's guilty pleas if
8    the USAO does not make a motion pursuant to U.S.S.G. § 5K1.1 for a
9    reduced guideline range or if the USAO makes such a motion and the
10   Court does not grant it or if the Court grants such a USAO motion but
11   elects to sentence above the reduced range.

12          d.    At this time the USAO makes no agreement or
13   representation as to whether any cooperation that defendant has
14   provided or intends to provide constitutes or will constitute
15   substantial assistance.  The decision whether defendant has provided
16   substantial assistance will rest solely within the exclusive judgment
17   of the USAO.

18          e.    The USAO's determination whether defendant has
19   provided substantial assistance will not depend in any way on whether
20   the government prevails at any trial or court hearing in which
21   defendant testifies or in which the government otherwise presents
22   information resulting from defendant's cooperation.

23                        <u>NATURE OF THE OFFENSES</u>

24       9.    Defendant understands that for defendant to be guilty of
25   the crime charged in count one, that is, Conspiracy, in violation of
26   Title 18, United States Code, Section 371, the following must be
27   true:  (1) Beginning no later than in or around 2007, and continuing
28   to in or around November 2013, there was an agreement between two or

1  or kickback in exchange for medical services; (3) a medical
2  professional person owed a fiduciary duty to the patient; (4) the
3  defendant acted with the intent to defraud by depriving the patient
4  of his or her right of honest services; (5) the defendant's act was
5  material, that is, it had a natural tendency to influence, or was
6  capable of influencing, a person's acts; and (6) the defendant used,
7  or caused someone to use, the mails to carry out or attempt to carry
8  out the scheme or plan.

9      12.   Defendant further understands that Interstate Travel in Aid
10  of a Racketeering Enterprise, in violation of Title 18, United States
11  Code, Section 1952(a)(3), has the following elements: (1) defendant
12  used the mail or a facility of interstate commerce with the intent to
13  promote, manage, establish, or carry on, or facilitate the promotion,
14  management, establishment, or carrying on, of unlawful activity,
15  specifically payment and receipt of kickbacks in violation of
16  California Business & Professions Code § 650, California Insurance
17  Code § 750, and California Labor Code § 3215; and (2) after doing so,
18  defendant performed or attempted to perform an act to promote,
19  manage, establish, or carry on, or facilitate the promotion,
20  management, establishment, or carrying on, of such unlawful activity.

21     13.   Defendant understands that Money Laundering, in violation
22  of Title 18, United States Code, Section 1957, has the following
23  elements: (1) the defendant knowingly engaged or attempted to engage
24  in a monetary transaction; (2) the defendant knew the transaction
25  involved criminally derived property; (3) the property had a value
26  greater than $10,000; (4) the property was, in fact, derived from
27  mail fraud; and (5) the transaction occurred in the United States.

28

1  more persons to commit Mail Fraud and Honest Services Mail Fraud, in
2  violation of Title 18, United States Code, Sections 1341 and 1346,
3  Interstate Travel in Aid of a Racketeering Enterprise, in violation
4  of Title 18, United States Code, Section 1952(a)(3), Monetary
5  Transactions in Property Derived from Specified Unlawful Activity, in
6  violation of Title 18, United States Code, Section 1957, and Payment
7  or Receipt of Kickbacks in Connection with a Federal Health Care
8  Program, in violation of Title 42, United States Code, Section 1320a-
9  7b(b)(2)(A); (2) defendant became a member of the conspiracy knowing
10  of at least one of its objects and intending to help accomplish it;
11  and (3) one of the members of the conspiracy performed at least one
12  overt act for the purpose of carrying out the conspiracy.
13      10.  Defendant understands that Mail Fraud, in violation of
14  Title 18, United States Code, Section 1341, has the following
15  elements: (1) the defendant knowingly devised or participated in a
16  scheme or plan to defraud, or a scheme or plan for obtaining money or
17  property by means of false or fraudulent pretenses, representations
18  or promises; (2) the statements made or facts omitted as part of the
19  scheme were material, that is, they had a natural tendency to
20  influence, or were capable of influencing, a person to part with
21  money or property; (3) the defendant acted with the intent to
22  defraud; and (4) the defendant used, or caused to be used, the mails
23  to carry out or attempt to carry out an essential part of the scheme.
24      11.  Defendant further understands that Honest Services Mail
25  Fraud, in violation of Title 18, United States Code, Sections 1341
26  and 1346, has the following elements: (1) the defendant devised or
27  participated in a scheme or plan to deprive a patient of his or her
28  right to honest services; (2) the scheme or plan consisted of a bribe

14.   Defendant further understands that for defendant to be guilty of the crime charged in count two of the information, that is, Payment of Kickbacks in Connection with a Federal Health Care Program, in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(A), the following must be true: (1) defendant knowingly and willfully paid remuneration, directly or indirectly, in cash or in kind, to another person; (2) the remuneration was given to induce that person to refer an individual for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program; and (3) defendant knew that such payment of remuneration was illegal.

PENALTIES AND RESTITUTION

15.   Defendant understands that the statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 371, is: 5 years imprisonment; a 3-year period of supervised release; a fine of $250,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

16.   Defendant understands that the statutory maximum sentence that the Court can impose for a violation of Title 42, United States Code, Section 1320a-7b(b)(2)(A), is: 5 years imprisonment; a 3-year period of supervised release; a fine of $250,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

17.   Defendant understands, therefore, that the total maximum sentence for all offenses to which defendant is pleading guilty is: 10 years imprisonment; a 3-year period of supervised release; a fine of $500,000 or twice the gross gain or gross loss resulting from the

11

1   offenses, whichever is greatest; and a mandatory special assessment
2   of $200.

3       18.   Defendant understands that supervised release is a period
4   of time following imprisonment during which defendant will be subject
5   to various restrictions and requirements.  Defendant understands that
6   if defendant violates one or more of the conditions of any supervised
7   release imposed, defendant may be returned to prison for all or part
8   of the term of supervised release authorized by statute for the
9   offense that resulted in the term of supervised release, which could
10  result in defendant serving a total term of imprisonment greater than
11  the statutory maximum stated above.

12      19.   Defendant understands that, by pleading guilty, defendant
13  may be giving up valuable government benefits and valuable civic
14  rights, such as the right to vote, the right to possess a firearm,
15  the right to hold office, and the right to serve on a jury.
16  Defendant understands that once the court accepts defendant's guilty
17  plea, it will be a federal felony for defendant to possess a firearm
18  or ammunition.  Defendant understands that the conviction in this
19  case may also subject defendant to various other collateral
20  consequences, including but not limited to revocation of probation,
21  parole, or supervised release in another case and suspension or
22  revocation of a professional license.  Defendant understands that
23  unanticipated collateral consequences will not serve as grounds to
24  withdraw defendant's guilty plea.

25      20.   Defendant understands that, if defendant is not a United
26  States citizen, the felony conviction in this case may subject
27  defendant to: removal, also known as deportation, which may, under
28  some circumstances, be mandatory; denial of citizenship; and denial

12

1  of admission to the United States in the future.  The court cannot,
2  and defendant's attorney also may not be able to, advise defendant
3  fully regarding the immigration consequences of the felony conviction
4  in this case.  Defendant understands that unexpected immigration
5  consequences will not serve as grounds to withdraw defendant's guilty
6  plea.

7      21.  Defendant understands that defendant will be required to
8  pay full restitution to the victims of the offenses to which
9  defendant is pleading guilty.  Defendant agrees that, in return for
10  the USAO's compliance with its obligations under this agreement, the
11  Court may order restitution to persons other than the victims of the
12  offenses to which defendant is pleading guilty and in amounts greater
13  than those alleged in the counts to which defendant is pleading
14  guilty.  In particular, defendant agrees that the Court may order
15  restitution to any victim of any of the following for any losses
16  suffered by that victim as a result:  (a) any relevant conduct, as
17  defined in U.S.S.G. § 1B1.3, in connection with the offenses to which
18  defendant is pleading guilty; and (b) any charges not prosecuted
19  pursuant to this agreement as well as all relevant conduct, as
20  defined in U.S.S.G. § 1B1.3, in connection with those counts and
21  charges.  The parties have not come to an agreement on the amount of
22  restitution.

23  <u>FACTUAL BASIS</u>

24      22.  Defendant admits that defendant is, in fact, guilty of the
25  offenses to which defendant is agreeing to plead guilty.  Defendant
26  and the USAO agree to the statement of facts provided below and agree
27  that this statement of facts is sufficient to support pleas of guilty
28  to the charges described in this agreement and to establish the

1  Sentencing Guidelines factors set forth in paragraph 24 below but is
2  not meant to be a complete recitation of all facts relevant to the
3  underlying criminal conduct or all facts known to either party that
4  relate to that conduct.

5      Pacific Hospital of Long Beach ("Pacific Hospital") was a
6  hospital located in Long Beach, California, specializing in
7  surgeries, particularly spinal and orthopedic surgeries.  From at
8  least in or around 1997 to October 2013, Pacific Hospital was owned
9  and/or operated by Michael D. Drobot ("Drobot Senior").  Drobot
10  Senior also owned and/or operated Pacific Specialty Physician
11  Management, Inc. ("PSPM"), a physician practice management company,
12  and two companies that managed in-house pharmaceutical dispensary
13  programs on behalf of doctors: California Pharmacy Management LLC
14  ("CPM") and Industrial Pharmacy Management LLC ("IPM") (collectively,
15  the "Dispensary Management Companies").  Beginning in or around 2003,
16  defendant operated CPM under the direction of Drobot Senior, with CPM
17  ceasing operations around 2007.  From 2007 to 2010, defendant and
18  Drobot Senior together owned, and defendant operated, IPM.  From 2010
19  to at least November 2013, defendant was the majority owner of IPM,
20  and controlled and directed its operations.

21      A.   The Hospital Kickback Scheme
22      Beginning no later than 2001 and continuing through in or around
23  November 2013, Drobot Senior, along with others working for Pacific
24  Hospital, the Dispensary Companies, PSPM, and related companies,
25  conspired with dozens of doctors, chiropractors, marketers, and
26  others to pay kickbacks in return for those persons to refer
27  thousands of patients to Pacific Hospital for spinal surgeries and
28  other medical services paid for primarily through the Federal

14

1  Employees' Compensation Act ("FECA") and the California Workers'
2  Compensation System ("CWCS").  In paying the kickbacks and submitting
3  the resulting claims for spinal surgeries and medical services,
4  including through the mails, the conspirators acted with the intent
5  to defraud workers' compensation insurance carriers and to deprive
6  the patients of their right of honest services.  In particular, the
7  conspirators knew that by paying kickbacks to doctors and
8  chiropractors who treated workers' compensation patients, they were
9  inducing the provision of spinal surgeries and other medical services
10 which could be paid for by a Federal health care program.
11      Beginning no later than in or around 2007 and continuing to in
12 or around 2013, in Orange and Los Angeles Counties, within the
13 Central District of California, and elsewhere, defendant, together
14 with other co-conspirators known and unknown to the United States
15 Attorney, knowingly combined, conspired, and agreed to commit the
16 following offenses against the United States in connection with the
17 above-described hospital kickback scheme: Mail Fraud and Honest
18 Services Mail Fraud, in violation of Title 18, United States Code,
19 Sections 1341 and 1346, Interstate Travel in Aid of a Racketeering
20 Enterprise, in violation of Title 18, United States Code, Section
21 1952(a)(3), Monetary Transactions in Property Derived from Specified
22 Unlawful Activity, in violation of Title 18, United States Code,
23 Section 1957, and Payment or Receipt of Kickbacks in Connection with
24 a Federal Health Care Program, in violation of Title 42, United
25 States Code, Section 1320a-7b(b)(2)(A).
26      As defendant knew, the hospital kickback scheme operated as
27 follows: Drobot Senior and other co-conspirators offered to pay
28 kickbacks to doctors, chiropractors, marketers, and others (the

1  "kickback recipients") in return for their referring workers'
2  compensation patients to Pacific Hospital for spinal surgeries, other
3  types of surgeries, magnetic resonance imaging, toxicology, durable
4  medical equipment, and other services which would be paid through
5  FECA and the CWCS.  As of approximately 2009, for spinal surgeries,
6  kickback recipients were typically paid $15,000 per lumbar fusion
7  surgery and $10,000 per cervical fusion surgery, provided that the
8  surgeon used in the surgery hardware supplied by a specified
9  distributor.
10     Influenced by the promise of kickbacks, the kickback recipients
11  referred patients insured through the CWCS and the FECA to Pacific
12  Hospital for spinal surgeries, other types of surgeries, and other
13  medical services.  In some cases, the patients lived dozens or
14  hundreds of miles from Pacific Hospital, and closer to other
15  qualified medical facilities.  The workers' compensation patients
16  were not informed that the medical professionals had been offered
17  kickbacks to induce them to refer the surgeries to Pacific Hospital.
18     Defendant knew that it was illegal to pay or receive kickbacks
19  for the referral of patients for medical services.  Defendant also
20  knew that the insurance carriers would be unwilling to pay claims for
21  medical services that were obtained through such illegal kickbacks.
22  However, as defendant knew, his co-conspirators deliberately did not
23  disclose to the insurance carriers the kickback payments.
24     Further, as defendant knew, to conceal the illegal kickback
25  payments from the workers' compensation insurance carriers and
26  patients, defendant's co-conspirators entered into bogus contracts
27  under which the kickback recipients purported to provide services to
28  Drobot Senior's companies to justify the kickback payments.  The

1  services and other items of value discussed in those contracts were,
2  in fact, generally not provided to Pacific Hospital or the other
3  companies, or were provided at highly inflated prices.  The
4  compensation to the kickback recipients was actually based on the
5  number and type of surgeries they referred to the hospital.  These
6  contracts included, among others, the following: collection
7  agreements, option agreements, research and development agreements,
8  lease and rental agreements, marketing agreements, and management
9  agreements.  Defendant learned the details of the hospital kickback
10 scheme by, among other means, participating in weekly executive
11 management meetings with Drobot Senior and other co-conspirators, in
12 which the conspirators discussed the details and status of the
13 kickback agreements with various doctors, chiropractors, and
14 marketers.

15 Defendant's primary role in the conspiracy involved his
16 operation of the Dispensary Management Companies.  In or around 2003,
17 defendant became the chief operating officer ("COO") of CPM, acting
18 under the direction of Drobot Senior.  CPM managed pharmaceutical
19 dispensaries located in doctors' and chiropractors' offices, which
20 dispensed medication to those doctors' and chiropractors' patients.
21 The conspirators used CPM as a vehicle to pay certain doctors and
22 chiropractors kickbacks for referring patients to Pacific Hospital
23 for spine surgeries and other services, and used the CPM dispensary
24 management contracts to cover up the true nature of the kickback
25 payments.  When IPM was formed in or about 2005, the conspirators
26 used it in a similar manner.

27 After he became the COO of CPM, defendant learned that Drobot
28 Senior and his co-conspirators were using CPM to facilitate the

17

1  kickback arrangements.  Beginning in or around 2005, defendant
2  himself began directly soliciting doctors and chiropractors to enter
3  into contracts with CPM.  In a number of cases, defendant discussed
4  with the doctors and chiropractors their interest in receiving
5  kickbacks in exchange for referring patients to Pacific Hospital for
6  spinal surgeries, and he introduced them to Drobot Senior to
7  negotiate the details of the arrangements.

8      In some cases, beginning in or around 2007, defendant also acted
9  as a liaison between certain kickback recipients on the one hand and
10 Drobot Senior and the other co-conspirators on the other hand.  For
11 example, when kickback recipients complained to defendant that Drobot
12 Senior and other co-conspirators were not paying kickbacks on time as
13 agreed, and threatened both to stop referring patients to Pacific
14 Hospital and to terminate their relationship with the Dispensary
15 Management Companies, defendant interceded to encourage the co-
16 conspirators to make the payments and to resolve the dispute.  In
17 other cases, when certain kickback recipients did not refer as many
18 patients to Pacific Hospital as the conspirators had expected,
19 defendant encouraged the kickback recipients to increase their rate
20 of referrals.  Defendant also worked with other co-conspirators to
21 track the number of referrals from certain kickback recipients, to
22 ensure they were given proper credit for those referrals.  In
23 addition, defendant worked with certain kickback recipients to
24 arrange for them to refer patients to certain surgeons, who in turn
25 had agreed to perform surgery on those patients at Pacific Hospital.

26     After defendant became the majority owner of IPM in August 2010
27 and assumed control of the company, he continued to coordinate with
28 certain kickback recipients to ensure that they continued referring

1  patients to Pacific Hospital and that, in return, Drobot Senior and

2  his co-conspirators continued to pay kickbacks, in some cases through

3  IPM.

4      B.   **The Dispensary Management Companies**

5      The Dispensary Management Companies contracted with doctors and

6  chiropractors to manage in-house pharmaceutical dispensaries located

7  in doctors' and chiropractors' offices.  Under the terms of many of

8  the contracts entered into by the parties, the doctor received either

9  the net monthly collections of the dispensary after paying to the

10 Dispensary Management Companies a percentage-based management fee, or

11 a fixed monthly amount secured by the dispensary's future

12 collections.  The contracts typically provided that the Dispensary

13 Management Companies would advance nearly all costs associated with

14 the dispensary, including if necessary, the purchase of prescription

15 drugs, and the salaries of pharmacy technicians who staffed the

16 dispensary, with the doctors ultimately responsible for any

17 shortfalls if the amounts collected were less than the amounts

18 advanced.

19     In practice, and as defendant sometimes promised the doctors,

20 the Dispensary Management Companies would not require doctors to

21 repay any shortfalls, to the extent any such shortfalls occurred.

22 The doctors were often advanced a certain minimum monthly payment,

23 and were required to do little more than write prescriptions meant to

24 be filled at the dispensary.  Thus, some doctors who entered into

25 contracts with the Dispensary Management Companies assumed little, if

26 any, financial risk related to the in-house dispensary.

27     In the event that collections from an in-house dispensary

28 dropped below the amount anticipated by the Dispensary Management

19

1   Companies, defendant or others from the Dispensary Management
2   Companies would, at times, encourage doctors to cause more patients
3   to fill prescriptions at the doctor's dispensary, or to cause
4   patients to fill more profitable prescriptions at the doctor's
5   dispensary.  If collections did not increase, the guaranteed monthly
6   payment to that doctor would be reduced in some cases, or the
7   doctor's contract would be terminated in other cases.

8        In some instances, the Dispensary Management Companies
9   influenced doctors to make available in the dispensary, and to
10  prescribe to appropriate patients, specific medications that were
11  promoted by the Dispensary Management Companies based on the
12  anticipated profit generated when those medications were prescribed
13  to worker's compensation patients.  This was accomplished through
14  several mechanisms, including by contractual language (in the case of
15  Surgeon D), by emphasizing the higher reimbursement rate associated
16  with a particular medication versus an alternative, or by offering to
17  increase or maintain a doctor's guaranteed monthly payment.

18       With respect to at least two doctors, defendant attempted to
19  leverage the referral of potential spinal surgery patients for the
20  benefit of the Dispensary Management Companies, either by
21  guaranteeing those referrals in return for a doctor's agreement to
22  engage the Dispensary Management Companies, or by threatening to
23  withdraw those referrals if the doctor terminated his contract with
24  the Dispensary Management Companies.

25       In those instances where defendant operated the Dispensary
26  Management Companies in the means identified above, defendant
27  intended to incentivize and reward doctors for writing prescriptions
28  to patients that would be filled in the doctors' in-house pharmacy.

Finally, on a number of occasions, defendant improperly induced doctors who contracted with the Dispensary Management Companies to use ancillary products and services offered by defendant, Medi-Lab Corporation ("Medi-Lab"), or companies affiliated with defendant. Those ancillary products and services included toxicology, magnetic resonance imaging, and Lanx spinal hardware (in the case of Medical Practice A located in Elmhurst, Illinois), none of which had any relation to the in-house dispensary program. Defendant induced the ancillary referrals either by increasing the guaranteed monthly payment for doctors with dispensary accounts in good standing, or by agreeing to maintain the existing guaranteed monthly payment for doctors whose guaranteed monthly payment amount was not commensurate with actual collection amounts. In return for referrals to Medi-Lab, defendant received a monthly payment from Medi-Lab designed, at least in part, to reimburse defendant for the kickback payments he had made to induce referrals to Medi-Lab.

In furtherance of the conspiracy and to accomplish the objects of the conspiracy, defendant and other co-conspirators committed various overt acts within the Central District of California, including but not limited to the following:

Overt Act No. 1

In or around March 2008, after Drobot Senior caused IPM to pay $60,000 to Surgeon A as a kickback for spinal surgeries Surgeon A performed at Pacific Hospital, defendant sought reimbursement for IPM from PSPM for the kickback payment made by IPM.

Overt Act No. 2

On or about May 12, 2008, Drobot Senior caused IPM to pay $35,000 to Chiropractor A, of which $18,000 represented a kickback

1  for spinal surgeries performed at Pacific Hospital on patients
2  referred by Chiropractor A.

3      Overt Act No. 3

4      On or about July 29, 2008, defendant sent an email message to
5  Executive A requesting a $60,000 payment from Pacific Hospital to IPM
6  as reimbursement for kickbacks paid by IPM for spinal surgeries
7  performed at Pacific Hospital, including $18,000 IPM had paid to
8  Chiropractor A in kickbacks.

9      Overt Act No. 4

10      On or about March 10, 2009, defendant advised Executive B that
11  Surgeon B was estimated to perform three to four spinal surgeries per
12  month at Pacific Hospital on patients referred to Surgeon B by Dr.
13  Philip Sobol, which referrals were caused by kickbacks paid to Dr.
14  Philip Sobol.

15      Overt Act No. 5

16      On or about June 15, 2011, defendant received an email message
17  from Pacific Hospital CFO James Canedo listing spinal surgeries
18  performed by, among others, Surgeon C, Surgeon D, and Surgeon E,
19  which were referred to Pacific Hospital by Dr. Philip Sobol, as a
20  result of kickbacks paid to Dr. Philip Sobol.

21      Overt Act No. 6

22      On or about April 30, 2012, defendant caused IPM to pay $155,000
23  to Surgeon F, of which $30,000 represented a kickback for spinal
24  surgeries performed at Pacific Hospital, either by Surgeon F or by
25  surgeons to whom Surgeon F referred surgical candidates.

26      Overt Act No. 7

27      On or about May 24, 2012, defendant caused IPM to pay $140,000
28  to Dr. Philip Sobol, of which $60,000 represented a kickback for

1  spinal surgeries performed at Pacific Hospital, either by Dr. Philip

2  Sobol or by surgeons to whom Dr. Philip Sobol referred surgical

3  candidates.

4       Overt Act No. 8

5       On or about July 2, 2012, Drobot Senior caused PSPM to pay

6  $23,706.80 to Surgeon B for performing surgeries at Pacific Hospital

7  and for referring surgical candidates to Surgeon G for spinal

8  surgeries at Pacific Hospital, including on patients covered by the

9  FECA and CWCS.

10                       SENTENCING FACTORS

11       23.  Defendant understands that in determining defendant's

12  sentence the Court is required to calculate the applicable Sentencing

13  Guidelines range and to consider that range, possible departures

14  under the Sentencing Guidelines, and the other sentencing factors set

15  forth in 18 U.S.C. § 3553(a).  Defendant understands that the

16  Sentencing Guidelines are advisory only, that defendant cannot have

17  any expectation of receiving a sentence within the calculated

18  Sentencing Guidelines range, and that after considering the

19  Sentencing Guidelines and the other § 3553(a) factors, the Court will

20  be free to exercise its discretion to impose any sentence it finds

21  appropriate up to the maximum set by statute for the crimes of

22  conviction.

23  //

24  //

25

26

27

28

23

24.   Defendant and the USAO agree to the following applicable Sentencing Guidelines factors:

Base Offense Level:                 6    [U.S.S.G. § 2B1.1(a)(2)]

Specific Offense
Characteristics

  Loss between
  $20M to $50M:                    +22   [U.S.S.G. § 2B1.1(b)(1)(L)]

  More than 10 victims:           +2   [U.S.S.G. § 2B1.1(b)(2)(B)]

  Federal health care
  offense with gov't
  program loss of
  between $1M-$7M:                 +2   [U.S.S.G. § 2B1.1(b)(7)]

Adjustments

  Aggravating Role:               +2   [U.S.S.G. § 3B1.1(a)]

  Acceptance of
  Responsibility:                 -3   [U.S.S.G. § 3E1.1]

Total:                             31

25.   The USAO will agree to a two-level downward adjustment for acceptance of responsibility (and, if applicable, move for an additional one-level downward adjustment under U.S.S.G. § 3E1.1(b)) only if the conditions set forth in paragraph 6(c)) are met.  Subject to paragraph 7 above and paragraph 37 below, defendant and the USAO agree not to seek, argue, or suggest in any way, either orally or in writing, that any other specific offense characteristics, adjustments, or departures relating to the offense level be imposed. Defendant agrees, however, that if, after signing this agreement but prior to sentencing, defendant were to commit an act, or the USAO were to discover a previously undiscovered act committed by defendant prior to signing this agreement, which act, in the judgment of the USAO, constituted obstruction of justice within the meaning of

1  U.S.S.G. § 3C1.1, the USAO would be free to seek the enhancement set

2  forth in that section.

3      26.  Defendant understands that there is no agreement as to

4  defendant's criminal history or criminal history category.

5      27.  Defendant and the USAO reserve the right to argue for a

6  sentence outside the sentencing range established by the Sentencing

7  Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1),

8  (a)(2), (a)(3), (a)(6), and (a)(7).

9                    WAIVER OF CONSTITUTIONAL RIGHTS

10     28.  Defendant understands that by pleading guilty, defendant

11 gives up the following rights:

12          a.   The right to persist in a plea of not guilty.

13          b.   The right to a speedy and public trial by jury.

14          c.   The right to be represented by counsel – and if

15 necessary have the court appoint counsel – at trial.  Defendant

16 understands, however, that, defendant retains the right to be

17 represented by counsel – and if necessary have the court appoint

18 counsel – at every other stage of the proceeding.

19          d.   The right to be presumed innocent and to have the

20 burden of proof placed on the government to prove defendant guilty

21 beyond a reasonable doubt.

22          e.   The right to confront and cross-examine witnesses

23 against defendant.

24          f.   The right to testify and to present evidence in

25 opposition to the charges, including the right to compel the

26 attendance of witnesses to testify.

27

28

                              25

1          g.   The right not to be compelled to testify, and, if

2   defendant chose not to testify or present evidence, to have that

3   choice not be used against defendant.

4          h.   Any and all rights to pursue any affirmative defenses,

5   Fourth Amendment or Fifth Amendment claims, and other pretrial

6   motions that have been filed or could be filed.

7                 WAIVER OF APPEAL OF CONVICTION

8      29.  Defendant understands that, with the exception of an appeal

9   based on a claim that defendant's guilty pleas were involuntary, by

10  pleading guilty defendant is waiving and giving up any right to

11  appeal defendant's convictions on the offenses to which defendant is

12  pleading guilty.

13            LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE

14     30.  Defendant agrees that, provided the Court imposes a total

15  term of imprisonment on all counts of conviction of no more than the

16  low end of the Guidelines range corresponding to a total offense

17  level of 31 and the criminal history category determined by the

18  Court, defendant gives up the right to appeal all of the following:

19  (a) the procedures and calculations used to determine and impose any

20  portion of the sentence; (b) the term of imprisonment imposed by the

21  Court; (c) the fine imposed by the court, provided it is within the

22  statutory maximum; (d) the amount and terms of any restitution order,

23  provided it requires payment of no more than $20 million; (e) the

24  term of probation or supervised release imposed by the Court,

25  provided it is within the statutory maximum; and (f) any of the

26  following conditions of probation or supervised release imposed by

27  the Court: the conditions set forth in General Orders 318, 01-05,

28  and/or 05-02 of this Court; the drug testing conditions mandated by

1  18 U.S.C. §§ 3563(a)(5) and 3583(d); and the alcohol and drug use

2  conditions authorized by 18 U.S.C. § 3563(b)(7).

3     31.   The USAO agrees that, provided (a) all portions of the

4  sentence are at or below the statutory maximum specified above and

5  (b) the Court imposes a term of imprisonment of no less than the low

6  end of the Guidelines range corresponding to an offense level of 31

7  and the criminal history category determined by the Court, the USAO

8  gives up its right to appeal any portion of the sentence, with the

9  exception that the USAO reserves the right to appeal the amount of

10  restitution ordered if that amount is less than $20 million.

11                RESULT OF WITHDRAWAL OF GUILTY PLEA

12     32.   Defendant agrees that if, after entering guilty pleas

13  pursuant to this agreement, defendant seeks to withdraw and succeeds

14  in withdrawing defendant's guilty pleas on any basis other than a

15  claim and finding that entry into this plea agreement was

16  involuntary, then (a) the USAO will be relieved of all of its

17  obligations under this agreement, including in particular its

18  obligations regarding the use of Cooperation Information; (b) in any

19  investigation, criminal prosecution, or civil, administrative, or

20  regulatory action, defendant agrees that any Cooperation Information

21  and any evidence derived from any Cooperation Information shall be

22  admissible against defendant, and defendant will not assert, and

23  hereby waives and gives up, any claim under the United States

24  Constitution, any statute, or any federal rule, that any Cooperation

25  Information or any evidence derived from any Cooperation Information

26  should be suppressed or is inadmissible; and (c) should the USAO

27  choose to pursue any charge or any civil, administrative, or

28  regulatory action that was either dismissed or not filed as a result

1  of this agreement, then (i) any applicable statute of limitations

2  will be tolled between the date of defendant's signing of this

3  agreement and the filing commencing any such action; and

4  (ii) defendant waives and gives up all defenses based on the statute

5  of limitations, any claim of pre-indictment delay, or any speedy

6  trial claim with respect to any such action, except to the extent

7  that such defenses existed as of the date of defendant's signing this

8  agreement.

9                     EFFECTIVE DATE OF AGREEMENT

10      33.   This agreement is effective upon signature and execution of

11  all required certifications by defendant, defendant's counsel, and an

12  Assistant United States Attorney.

13                        BREACH OF AGREEMENT

14      34.   Defendant agrees that if defendant, at any time after the

15  signature of this agreement and execution of all required

16  certifications by defendant, defendant's counsel, and an Assistant

17  United States Attorney, knowingly violates or fails to perform any of

18  defendant's obligations under this agreement ("a breach"), the USAO

19  may declare this agreement breached.   For example, if defendant

20  knowingly, in an interview, before a grand jury, or at trial, falsely

21  accuses another person of criminal conduct or falsely minimizes

22  defendant's own role, or the role of another, in criminal conduct,

23  defendant will have breached this agreement.   All of defendant's

24  obligations are material, a single breach of this agreement is

25  sufficient for the USAO to declare a breach, and defendant shall not

26  be deemed to have cured a breach without the express agreement of the

27  USAO in writing.   If the USAO declares this agreement breached, and

28  the Court finds such a breach to have occurred, then:

a.    If defendant has previously entered guilty pleas pursuant to this agreement, defendant will not be able to withdraw the guilty pleas.

b.    The USAO will be relieved of all its obligations under this agreement; in particular, the USAO: (i) will no longer be bound by any agreements concerning sentencing and will be free to seek any sentence up to the statutory maximum for the crimes to which defendant has pleaded guilty; (ii) will no longer be bound by any agreements regarding criminal prosecution, and will be free to criminally prosecute defendant for any crime, including charges that the USAO would otherwise have been obligated not to criminally prosecute pursuant to this agreement; and (iii) will no longer be bound by any agreement regarding the use of Cooperation Information and will be free to use any Cooperation Information in any way in any investigation, criminal prosecution, or civil, administrative, or regulatory action.

c.    The USAO will be free to criminally prosecute defendant for false statement, obstruction of justice, and perjury based on any knowingly false or misleading statement by defendant.

d.    In any investigation, criminal prosecution, or civil, administrative, or regulatory action: (i) defendant will not assert, and hereby waives and gives up, any claim that any Cooperation Information was obtained in violation of the Fifth Amendment privilege against compelled self-incrimination; and (ii) defendant agrees that any Cooperation Information and any Plea Information, as well as any evidence derived from any Cooperation Information or any Plea Information, shall be admissible against defendant, and defendant will not assert, and hereby waives and gives up, any claim

under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other federal rule, that any Cooperation Information, any Plea Information, or any evidence derived from any Cooperation Information or any Plea Information should be suppressed or is inadmissible.

35.  Following the Court's finding of a knowing breach of this agreement by defendant, should the USAO choose to pursue any charge or any civil, administrative, or regulatory action that was either dismissed or not filed as a result of this agreement, then:

a.  Defendant agrees that any applicable statute of limitations is tolled between the date of defendant's signing of this agreement and the filing commencing any such action.

b.  Defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

## COURT AND PROBATION OFFICE NOT PARTIES

36.  Defendant understands that the Court and the United States Probation Office are not parties to this agreement and need not accept any of the USAO's sentencing recommendations or the parties' agreements to facts or sentencing factors.

37.  Defendant understands that both defendant and the USAO are free to: (a) supplement the facts by supplying relevant information to the United States Probation Office and the Court, and (b) correct any and all factual misstatements relating to the Court's Sentencing Guidelines calculations and determination of sentence.  While this

30

1    paragraph permits both the USAO and defendant to submit full and
2    complete factual information to the United States Probation Office
3    and the Court, even if that factual information may be viewed as
4    inconsistent with the facts agreed to in this agreement, this
5    paragraph does not affect defendant's and the USAO's obligations not
6    to contest the facts agreed to in this agreement.

7        38.   Defendant understands that even if the Court ignores any
8    sentencing recommendation, finds facts or reaches conclusions
9    different from those agreed to, and/or imposes any sentence up to the
10   maximum established by statute, defendant cannot, for that reason,
11   withdraw defendant's guilty pleas, and defendant will remain bound to
12   fulfill all defendant's obligations under this agreement.  Defendant
13   understands that no one -- not the prosecutor, defendant's attorney,
14   or the Court -- can make a binding prediction or promise regarding
15   the sentence defendant will receive, except that it will be within
16   the statutory maximum.

17                        NO ADDITIONAL AGREEMENTS

18       39.   Defendant understands that, except as set forth herein,
19   there are no promises, understandings, or agreements between the USAO
20   and defendant or defendant's attorney, and that no additional
21   promise, understanding, or agreement may be entered into unless in a
22   writing signed by all parties or on the record in court.
23   //
24   //
25
26
27
28

31

## PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

40.   The parties agree that this agreement will be considered part of the record of defendant's guilty plea hearing as if the entire agreement had been read into the record of the proceeding.

AGREED AND ACCEPTED

UNITED STATES ATTORNEY'S OFFICE
FOR THE CENTRAL DISTRICT OF
CALIFORNIA

EILEEN M. DECKER
United States Attorney


SCOTT D. TENLEY                            12/7/15
Assistant United States Attorney           Date


MICHAEL R. DROBOT                          12-3-15
Defendant                                  Date


JASON DE BRETTEVILLE                       12-3-15
Attorney for Defendant MICHAEL R.          Date
DROBOT

32

<u>CERTIFICATION OF DEFENDANT</u>

I have read this agreement in its entirety. I have had enough time to review and consider this agreement, and I have carefully and thoroughly discussed every part of it with my attorney. I understand the terms of this agreement, and I voluntarily agree to those terms. I have discussed the evidence with my attorney, and my attorney has advised me of my rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement. No promises, inducements, or representations of any kind have been made to me other than those contained in this agreement. No one has threatened or forced me in any way to enter into this agreement. I am satisfied with the representation of my attorney in this matter, and I am pleading guilty because I am guilty of the charges and wish to take advantage of the promises set forth in this agreement, and not for any other reason.

_____          12-3-15
MICHAEL R. DROBOT                         Date
Defendant

33

## CERTIFICATION OF DEFENDANT'S ATTORNEY

I am MICHAEL R. DROBOT's attorney.  I have carefully and thoroughly discussed every part of this agreement with my client. Further, I have fully advised my client of his rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement. To my knowledge: no promises, inducements, or representations of any kind have been made to my client other than those contained in this agreement; no one has threatened or forced my client in any way to enter into this agreement; my client's decision to enter into this agreement is an informed and voluntary one; and the factual basis set forth in this agreement is sufficient to support my client's entry of guilty pleas pursuant to this agreement.

_____          _12-3-15_____
JASON DE BRETTEVILLE                    Date
Attorney for Defendant MICHAEL R.
DROBOT

34

# Exhibit A

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | SA CR No. 15- |
| Plaintiff, | I N F O R M A T I O N |
| v. | [18 U.S.C. § 371: Conspiracy; 42 U.S.C. § 1320a-7b(b)(2)(A): |
| MICHAEL R. DROBOT, | Payment of Kickbacks in Connection with a Federal Health Care |
| Defendant. | Program] |

The United States Attorney charges:

COUNT ONE

[18 U.S.C. § 371]

A.   RELEVANT PERSONS AND ENTITIES

At all times relevant to this Information:

1.   Pacific Hospital of Long Beach ("Pacific Hospital") was a hospital located in Long Beach, California, specializing in surgeries, particularly spinal and orthopedic surgeries.  From at least in or around 1997 to in or around November 2013, Pacific Hospital was owned and/or operated by Michael D. Drobot ("Drobot Senior"), defendant MICHAEL R. DROBOT's ("defendant DROBOT") father.

1      2.    California Pharmacy Management, Inc. ("CPM") was a

2  corporation formed and owned by Drobot Senior.  CPM contracted with

3  doctors to manage doctors' in-house pharmaceutical dispensaries,

4  providing such services as logistical, billing, and collection

5  services on behalf of the in-house pharmacies.  From 2003 to 2007,

6  defendant DROBOT operated and/or controlled CPM along with Drobot

7  Senior.

8      3.    Industrial Pharmacy Management LLC ("IPM," and collectively

9  with CPM, the "Dispensary Management Companies"), was a limited

10 liability company formed in 2006 by Drobot Senior.  Like CPM, IPM

11 also contracted with doctors to manage doctors' in-house pharmacies.

12 From 2007 to 2010, defendant DROBOT and Drobot Senior together owned,

13 and defendant operated, IPM.  From 2010 to at least November 2013,

14 defendant DROBOT was the majority owner of IPM, and controlled and

15 directed its operations.

16 B.  RELEVANT LEGISLATION

17     4.    The California Worker's Compensation System ("CWCS") was a

18 system created by California law to provide insurance covering

19 treatment of injury or illness suffered by individuals in the course

20 of their employment.  Under the CWCS, employers were required to

21 purchase workers' compensation insurance policies from insurance

22 carriers to cover their employees.  When an employee suffered a

23 covered injury or illness and received medical services, the medical

24 service provider submitted a claim for payment to the relevant

25 insurance carrier, which then paid the claim.  Claims were submitted

26 to and paid by the insurance carriers either by mail or

27 electronically.  The CWCS was governed by various California laws and

28 regulations.

5.   The California State Compensation Insurance Fund ("SCIF") was a non-profit insurance carrier, created by the California Legislature, which provided workers' compensation insurance to employees in California, including serving as the "insurer of last resort" under the CWCS system for employees without any other coverage.

6.   California law, including but not limited to the California Business and Professions Code, the California Insurance Code, and the California Labor Code, prohibited the offering, delivering, soliciting, or receiving anything of value in return for referring a patient for medical services.

7.   The Federal Employees' Compensation Act ("FECA") provided benefits to civilian employees of the United States, including United States Postal Service employees, for medical expenses and wage-loss disability due to traumatic injury or occupational disease sustained while working as a federal employee.  Benefits available to injured employees included rehabilitation, medical, surgical, hospital, pharmaceutical, and supplies for treatment of injury.  The Department of Labor ("DOL") - Office of Workers' Compensation Programs ("OWCP") was the governmental body responsible for administering the FECA. When a federal employee suffered a covered injury or illness and received medical services, the medical service provider submitted a claim for payment by mail or electronically to Affiliated Computer Services ("ACS"), located in London, Kentucky, which was contracted with the DOL to handle such claims.  Upon approval of the claim, ACS sent payment by mail or electronic funds transfer from the U.S. Treasury in Philadelphia, Pennsylvania, to the medical service provider.

1     8.    Federal law prohibited the offering, delivering,

2 soliciting, or receiving of anything of value in return for referring

3 a patient for medical services paid for by a federal health care

4 benefit program.

5 C.   OBJECTS OF THE CONSPIRACY

6     9.    Beginning in or around 2007 and continuing to in or around

7 November 2013, in Orange and Los Angeles Counties, within the Central

8 District of California, and elsewhere, defendant DROBOT, together

9 with other co-conspirators known and unknown to the United States

10 Attorney, knowingly combined, conspired, and agreed to commit the

11 following offenses against the United States: 18 U.S.C. §§ 1341 and

12 1346 (Mail Fraud and Honest Services Fraud); 18 U.S.C. § 1952(a)(3)

13 (Interstate Travel in Aid of Racketeering Enterprise); 18 U.S.C.

14 § 1957 (Monetary Transactions in Property Derived from Specific

15 Unlawful Activity); and 42 U.S.C. § 1320a-7b(b)(2)(A) (Payment or

16 Receipt of Kickbacks in Connection with a Federal Health Care

17 Program).

18 D.   MANNER AND MEANS TO ACCOMPLISH THE CONSPIRACY

19     10.   The objects of the conspiracy were to be carried out, and

20 were carried out, in the following ways, among others:

21     a.    Drobot Senior and other co-conspirators offered to pay

22 kickbacks to dozens of doctors, chiropractors, marketers, and others

23 for their referring workers' compensation patients to Pacific

24 Hospital for spinal surgeries, other types of surgeries, magnetic

25 resonance imaging, toxicology, durable medical equipment, and other

26 services, to be paid primarily through CWCS and the FECA. As of

27 approximately 2009, for spinal surgeries, kickback recipients were

28 typically paid $15,000 per lumbar fusion surgery and $10,000 per

1    cervical fusion surgery, provided that the surgeon used in the

2    surgery hardware supplied by a specified distributor.

3          b.    Influenced by the promise of kickbacks, doctors,

4    chiropractors, marketers, and others referred patients insured

5    through the CWCS and the FECA to Pacific Hospital for spinal

6    surgeries, other types of surgeries, and other medical services.  The

7    workers' compensation patients were not informed that the medical

8    professionals had been offered kickbacks to induce them to refer the

9    surgeries to Pacific Hospital.

10          c.    The surgeries and other medical services were

11    performed on the referred workers' compensation patients at Pacific

12    Hospital.

13          d.    Pacific Hospital submitted claims, by mail and

14    electronically, to SCIF and other workers' compensation insurance

15    carriers for payment of the costs of the surgeries and other medical

16    services.

17          e.    As defendant DROBOT and the other co-conspirators knew

18    and intended, and as was reasonably foreseeable to them, in

19    submitting claims for payment, Pacific Hospital made materially false

20    and misleading statements to, and concealed material information

21    from, SCIF and other workers' compensation insurance carriers,

22    including that Pacific Hospital did not disclose to the insurance

23    carriers that it had offered or paid kickbacks for the referral of

24    the surgeries and other medical services for which it was submitted

25    claims.

26          f.    The insurance carriers paid Pacific Hospital's claims,

27    by mail or electronically.

28

5

1        g.   Among other means used to pay kickback recipients,

2 defendant DROBOT, Drobot Senior, and other co-conspirators caused the

3 Dispensary Management Companies to pay certain doctors and

4 chiropractors kickbacks for referring patients to Pacific Hospital

5 for spine surgeries and other services, and used the Dispensary

6 Management Companies' contracts with those doctors and chiropractors

7 to cover up the kickback arrangement.

8        h.   Defendant DROBOT and other co-conspirators recorded

9 and/or tracked the number of surgeries and other medical services

10 performed at Pacific Hospital due to referrals from the kickback

11 recipients, as well as amounts paid to the kickback recipients for

12 those referrals.

13 E.   EFFECTS OF THE CONSPIRACY

14     11.  Had SCIF and the other workers' compensation insurance

15 carriers known the true facts regarding the payment of kickbacks for

16 the referral of workers' compensation patients for surgeries and

17 other medical services performed at Pacific Hospital, they would not

18 have paid the claims or would have paid a lesser amount.

19     12.  From in or around 2008 to in or around April 2013, Pacific

20 Hospital billed workers' compensation insurance carriers

21 approximately $500 million in claims for spinal surgeries that were

22 the result of the payment of a kickback; and defendant DROBOT or

23 other co-conspirators paid kickback recipients between approximately

24 $20 million and $50 million in kickbacks relating to those claims.

25 F.   OVERT ACTS IN FURTHERANCE OF THE CONSPIRACY

26     13.  In furtherance of the conspiracy and to accomplish the

27 objects of the conspiracy, defendant DROBOT and other co-conspirators

28 known and unknown to the United States Attorney, committed various

overt acts within the Central District of California, including but
not limited to the following:

    Overt Act No. 1:

    In or around March 2008, after Drobot Senior caused IPM to pay
$60,000 to Surgeon A as a kickback for spinal surgeries Surgeon A
performed at Pacific Hospital, defendant DROBOT sought reimbursement
for IPM from PSPM for the kickback payment made by IPM.

    Overt Act No. 2:

    On or about May 12, 2008, Drobot Senior caused IPM to pay
$35,000 to Chiropractor A, of which $18,000 represented a kickback
for spinal surgeries performed at Pacific Hospital on patients
referred by Chiropractor A.

    Overt Act No. 3:

    On or about July 29, 2008, defendant DROBOT sent an email
message to Executive A requesting a $60,000 payment from Pacific
Hospital to IPM as reimbursement for kickbacks paid by IPM for spinal
surgeries performed at Pacific Hospital, including $18,000 IPM had
paid to Chiropractor A in kickbacks.

    Overt Act No. 4:

    On or about March 10, 2009, defendant DROBOT advised Executive B
that Surgeon B was estimated to perform three to four spinal
surgeries per month at Pacific Hospital on patients referred to
Surgeon B by Dr. Philip Sobol, which referrals were caused by
kickbacks paid to Dr. Philip Sobol.

    Overt Act No. 5:

    On or about June 15, 2011, defendant DROBOT received an email
message from Pacific Hospital CFO James Canedo listing spinal
surgeries performed by, among others, Surgeon C, Surgeon D, and

1  Surgeon E, which were referred to Pacific Hospital by Dr. Philip

2  Sobol, as a result of kickbacks paid to Dr. Philip Sobol.

3      Overt Act No. 6:

4      On or about April 30, 2012, defendant DROBOT caused IPM to pay

5  $155,000 to Surgeon F, of which $30,000 represented a kickback for

6  spinal surgeries performed at Pacific Hospital, either by Surgeon F

7  or by surgeons to whom Surgeon F referred surgical candidates.

8      Overt Act No. 7:

9      On or about May 24, 2012, defendant DROBOT caused IPM to pay

10  $140,000 to Dr. Philip Sobol, of which $60,000 represented a kickback

11  for spinal surgeries performed at Pacific Hospital, either by Dr.

12  Philip Sobol or by surgeons to whom Dr. Philip Sobol referred

13  surgical candidates.

14      Overt Act No. 8:

15      On or about July 2, 2012, Drobot Senior caused PSPM to pay

16  $23,706.80 to Surgeon B for performing surgeries at Pacific Hospital

17  and for referring surgical candidates to Surgeon G for spinal

18  surgeries at Pacific Hospital, including on patients covered by the

19  FECA and CWCS.

20

21

22

23

24

25

26

27

28

COUNT TWO

[42 U.S.C. § 1320a-7b(b)(2)(A)]

14.   Paragraphs one through thirteen of this Information are re-alleged and incorporated as if fully set forth herein.

15.   Beginning in or around 2003 and continuing to in or around November 2013, in Orange and Los Angeles Counties, within the Central District of California, and elsewhere, defendant MICHAEL R. DROBOT, together with other co-conspirators known and unknown to the United States Attorney, knowingly and willfully offered and paid remuneration, that is, cash and checks, directly and indirectly, to person to induce those persons to refer individuals to Pacific Hospital for spinal surgery and other medical services for which payment could be made in whole and in part under a Federal health care program, namely, the FECA.

EILEEN M. DECKER
United States Attorney


LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division

DENNISE D. WILLETT
Assistant United States Attorney
Chief, Santa Ana Branch Office

JOSHUA M. ROBBINS
Assistant United States Attorney

SCOTT D. TENLEY
Assistant United States Attorney

ASHWIN JANAKIRAM
Special Assistant United States Attorney

9

CERTIFICATE OF SERVICE

I am a citizen of the United States and a resident of Orange County, California.  I am over 18 years of age, and I am not a party to the above-entitled action.  My business address is the United States Attorney's Office, Ronald Reagan Federal Building and United States Courthouse, 411 West Fourth Street, Suite 8000, Santa Ana, California 92701.

**On this date, December 10, 2015, I served conformed copies of the documents filed on December 10, 2015 on defense counsel representing this defendant.  Said service was conducted in the following manner:**

by placing a true copy in a sealed envelope, addressed to the person specified below, and placing it for interoffice delivery within the courthouse:

by placing the document in a sealed envelope, addressed as follows and with postage placed thereon, and placing it for delivery via the U.S. Postal Service:

by fax to the person and fax number specified below:

X    **by e-mailing a pdf. version of the documents to the e-mail address of said defense counsel:**

I declare under penalty of perjury that the foregoing is true and correct, executed on December 10, 2015, at Santa Ana, California.

_____
CRISTY FILLON